

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LAMAR CALVIN WHITE, | § | No. 08-23-00238-CR |
| Appellant, | § | Appeal from the |
| v. | § | 379th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC#2021-CR-3443) |

**<u>MEMORANDUM OPINION[1]</u>**

A jury convicted appellant, Lamar Calvin White, of aggravated assault with a deadly weapon, causing serious bodily injury against a person with whom he has, or had, a dating relationship. White presents three issues on appeal. In his first two issues, he contends the trial court erred: (1) when it failed to grant a mistrial; and (2) by admitting a video tape of his statements, which were captured on bodycam footage. In his third and final issue, he contends the evidence was legally insufficient to support the jury's rejection of his self defense claim. We affirm.

---

[1] We hear this case on transfer from the Fourth Court of Appeals in San Antonio and apply that court's precedent as required by Tex. R. App. P. 41.3.

## BACKGROUND

White was charged by indictment with intentionally, knowingly, and recklessly causing serious bodily injury to Aaliyah Hardy, a person with whom he had a dating relationship as described by § 71.0021 of the Texas Family Code, and doing so by shooting her with a firearm. The charging instrument also alleged that White was a repeat offender as he was previously convicted of the felony of assault of a public servant. White pleaded not guilty, and the case proceeded to a jury trial. The State presented evidence through the testimony of 13 witnesses and approximately 60 exhibits. The evidence at trial established the following.

Hardy and White were in a romantic relationship for a few months, which ended in October 2020. On January 28, 2021, White sent Hardy messages that made her feel scared for herself, her child, and other family members. The messages continued into January 30, 2021. On that date, White sent Hardy a voicemail accusing her of having sexual relationships with different people. He also sent other voicemails that were similar in tone and nature. Hardy made the decision to go over to White's residence and call the police. She messaged White asking if she could come over.

Hardy arrived at White's apartment complex in the late afternoon. While remaining in her parked car, Hardy called 911. Hardy saw White coming towards her vehicle and relayed the information to the 911 operator. Simultaneously, White approached her. As he tried to open the passenger door, he asked, "Why did you come here if you weren't gonna speak to me[?]" Hardy described that he sounded irritated and angry. White then pointed his gun towards her car's back passenger tire and shot it out. Hardy shouted and told the 911 operator that he had shot at her car. Hardy described that she drove in reverse for a few feet but then stopped. She was worried that if she moved any more that White would shoot again. She tried to figure out how to avoid getting shot. She soon decided to escape by driving through a wooden gate, but when she attempted to do

so, her car got stuck. At that point, White began shooting at her again. She yelled out multiple times. To the 911 operator, she reported, "he shot me." When asked on cross-examination why a revving engine could be heard on the recording of the 911 call, Hardy answered that she had sped up to drive through the gate. Hardy was also asked why she drove towards White instead of driving away from him. Hardy denied she had driven towards White, re-urging that she was driving towards the gate.

The 911 operator continued talking with Hardy as she waited for police to arrive. Hardy told the operator that she could see White walking back to the apartment. Soon, officers with the San Antonio Police Department (SAPD) and EMS arrived and attended to Hardy. Hardy remembers waking up at the hospital. She stated she had to have surgery to place a tube in her lung. In describing her injuries, Hardy described that one bullet skimmed her nose, two bullets were removed form her body, and two bullets could not be removed because of nerve damage. Hardy also had three broken ribs. A total of twelve bullet casings were collected during the ensuing investigation.

After Hardy had departed by ambulance, SAPD officers set up a crime scene. Additional officers were called to surround the building as police believed White had barricaded himself inside a nearby apartment. White did not return to his own apartment but went to his neighbor's apartment. Nicole Gomez testified she was at Ashley "Apple" Lopez's apartment with two other friends when they heard multiple gunshots. Soon thereafter, they heard a knock on the door. Gomez testified it was White, who she knew as one of Ashley's neighbors. She testified he came in and went towards the back of the apartment. She described White as appearing nervous, but he did not say anything at that point. Next, SAPD officers knocked and announced that residents needed to exit the apartment, one by one, with their hands up. At this point, Gomez described that White

3

appeared even more nervous, and she heard him say that he was just trying to defend himself. In more detail, Gomez said she guessed White was telling her that a woman was trying to hit him with a car, and he just did what he had to do. Soon they all exited the apartment. Gomez reported that SAPD placed them all in handcuffs. After giving a statement, Gomez and her other friends were released.

SAPD officers detained White. He was handcuffed and placed in the back of one of the patrol cars. The SAPD then searched both White's apartment and Ashley's apartment. During the search, the police located the firearm in the tank of the toilet in Ashley's apartment.

White did not testify, and the defense called no witnesses during its case in chief. During closing statements, White argued he shot Hardy in self defense and did whatever he could to stop the car from running him over. He argued his instinct made him shoot multiple times.

The jury found White guilty of the offense of aggravated assault with a deadly weapon causing serious bodily injury against a person with whom he had a dating relationship. The trial court then assessed White's punishment. After finding the enhancement allegation not true, the court sentenced White to 35 years' confinement in the Texas Department of Criminal Justice. The trial court additionally made an affirmative finding of a deadly weapon and an affirmative finding of family violence. White appealed.

## SELF DEFENSE

Because the third issue would afford White the greatest relief if sustained, we reorder the issues and begin with the sufficiency issue related to his claim of self-defense. *See Lopez v. State*, 615 S.W.3d 238, 248 (Tex. App.—El Paso 2020, pet. ref'd) (citing *Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010)). White asserts the State failed to present sufficient evidence to refute that he did not fire the weapon in self-defense. We interpret this contention as an assertion

4

that the evidence is insufficient to support the jury's implicit rejection of his claim of acting in self-defense.

## A. Standard of review and applicable law

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). A reasonable belief is one held by "an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(a)(42). As the Court of Criminal Appeals describes, there is a subjective and objective component to a self-defense claim: that is, not only must an actor subjectively believe the use of force is immediately necessary to protect oneself, but that belief must be objectively reasonable. *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021).

A defendant raising the issue of self-defense has the burden of producing evidence to support the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State then has the burden of persuasion to rebut the defense; the State does not have a burden of production of evidence. *Id.* A guilty verdict implicitly rejects a defendant's theory of self-defense. *Id.* Because the State bears the burden of persuasion to disprove self-defense by establishing its case beyond a reasonable doubt, we review sufficiency challenges to the jury's rejection of self-defense under the *Jackson* standard. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense; but rather, we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against

appellant on the self-defense issue beyond a reasonable doubt. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018).

It is solely the job of the fact-finder to assess witness credibility and attach weight to the witnesses' testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As a reviewing court, we may not "sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988). Thus, the fact-finder, as the sole arbiter of witness credibility, can choose to believe or disbelieve witness testimony. *Metcalf*, 597 S.W.3d at 855. Further, only the fact-finder acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). When the record supports conflicting inferences, we defer to the fact-finder to resolve those conflicts and assume the conflicts were resolved in favor of the judgment. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). Furthermore, the issue of self-defense is a fact issue for the fact-finder to resolve. *Saxton*, 804 S.W.2d at 913.

A person commits the offense of aggravated assault if the person intentionally, knowingly, or recklessly causes serious bodily injury to another. *See* Tex. Penal Code Ann. 22.01(a)(1); 22.02(a)(1). The assault becomes aggravated when the person causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. *See* Tex. Penal Code Ann. § 22.02(a)(1), (2). The Penal Code defines a deadly weapon as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury". Tex. Penal Code Ann. § 1.07(a)(17)(B). Further, serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss

6

or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(a)(46).

### B. Analysis

White acknowledges the State has no burden to produce additional evidence to refute a self-defense assertion. He further acknowledges that the jury's guilty verdict is an implied finding rejecting his self-defense theory. Nevertheless, White contends this case is clearly distinguishable because, he argues, the State introduced evidence concerning his self-defense theory, but it then failed to further investigate the matter. Specifically, he asserts Gomez's testimony, which included a statement attributed to him describing that he merely defended himself when Hardy attempted to hit him with her car, causing him to do what he needed to do for his own protection. He also asserts that one of the detectives on the case testified that he said he was assigned to the case to investigate the allegations of self-defense. White asserts that the police failed to conduct any investigation into self-defense and therefore the State did not disprove his claim of self-defense beyond a reasonable doubt. We disagree.

Although White acknowledges the State's burden in disproving a self-defense claim, he still attempts to place the burden of production on the State to rebut the defense. *See Zuliani*, 97 S.W.3d at 594 (stating a defendant that raises a self-defense claim has the burden of producing evidence to support the defense and the State only has the burden of persuasion to rebut the defense). The State meets its burden of persuasion by proving its case beyond a reasonable doubt.

The State presented evidence that White had left threatening messages for Hardy on the days leading up to the shooting. Furthermore, the jury heard Hardy's testimony and the 911 call. White did not deny that he shot Hardy; but, rather, he claimed he shot her because she had tried to run him over with her car. Although he argued that Hardy was "stalking" White, and that she drove

the car towards him instead of another direction, Hardy herself denied doing so. Additionally, the jury was free to disbelieve White's statements to Gomez that he was just defending himself. To the extent White's framing of the events presented conflicting versions, the jury was able to decide whether to believe or disbelieve his version. *See Braughton*, 569 S.W.3d at 610 (stating that given two conflicting versions of events, it was the job of the jury to decide whether to believe Appellant's self-defense claim); *see also Padilla v. State*, 254 S.W.3d 585, 590 (Tex. App.—Eastland 2008, pet. ref'd) ("If believed, the victim's testimony alone is sufficient to support a guilty verdict."). Accordingly, the jury believed Hardy and rejected White's theory.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of aggravated assault were met and found against White's claim of self-defense beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 19.03; *see also Braughton*, 569 S.W.3d at 609. We overrule White's third issue.

## MISTRIAL

In his first issue, White contends the trial court abused its discretion in denying his motion for mistrial. White contends the State violated the trial court's orders, specifically an order on a motion in limine, in three different instances.

### A.  Standard of review

A trial court's denial of a mistrial is reviewed for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A prompt instruction from the trial judge is usually enough to cure error, if any, and avoid the need for a mistrial. *Wesbrook v. State*, 29 S.W.3d 103, 115–16 (Tex. Crim. App. 2000) (en banc). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ladd*, 3 S.W.3d at 567.

8

When assessing action on a motion for mistrial, "[d]eterminations of historical fact and assessment of witness credibility and believability are left almost entirely to the discretion of the trial judge, and where there is conflicting evidence there is no abuse of discretion if the motion is overruled." *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). An appellate court views the evidence in the light most favorable to the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id.*

To determine whether the trial court abused its discretion in denying a motion for mistrial, we examine three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction absent the misconduct. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc); *see also Archie v. State*, 340 S.W.3d 734, 740 (Tex. Crim. App. 2011) (applying *Mosley* factors to denial of motion for mistrial).

## B. The court's in limine order

White contends the State violated the trial court's order on motion in limine three different times during the direct examination of Hardy. Although our record lacks an in limine order, the existence of such order is not disputed. And our review of the record shows the trial court in fact ordered the State, before any mention of harassment or that such happened before the day of the incident, to approach and obtain a ruling from the court.

### (1) The first alleged violation

First, White contends the State produced evidence through a 911 call that informed the jury of White's alleged harassment of Hardy prior to the date of the incident. At trial, the State offered a 911 call into evidence and White objected on two grounds: (1) that the State failed to lay

9

the proper predicate for the custodian of records; and (2) relevance. The trial court overruled the objections and admitted the exhibit into evidence.

While the call was being played for the jury, Hardy can be heard telling the 911 operator that White had been harassing her. White objected. At the bench, White argued the call directly violated the motion in limine in talking about harassment. The State assured the trial court that it had forgotten the statement was included in the 911 call. And the State also expressed that it had believed the motion in limine had merely referred to Hardy's testimony. The State offered that any error was remedied by a 404(b) instruction. Also, the State asserted that the statement went to the nature of the relationship between Hardy and White and any prejudice was outweighed by the probative value. The trial court then held a hearing outside the presence of the jury where it heard argument from the parties. White re-urged his objection that the State violated the court's order and asserted the challenged statement was not relevant. White also requested the trial court grant a mistrial.

The trial court denied the motion for mistrial, overruled the relevancy objection, and overruled the 403 objection. The trial court stated it could provide a limiting instruction regarding the 911 call. When the jury returned, the trial court instructed the jury to disregard the word "harassment" and not to consider it for any purpose. It further gave the jury a 404(b) limiting instruction. Additionally, the State substituted the first admitted exhibit of the 911 call with a version that redacted the harassment language.

### (2) The second alleged violation

Next, White contends the State violated the court's in limine order when Hardy testified that she went to White's apartment "so that the police would know he was home and could be

10

arrested, implying that a warrant for other crimes or actions existed for [White]." During Hardy's

testimony, she was explaining some messages she received from White and stated:

> That was when I was trying to go talk to him. The police could not make an arrest
> unless they confirmed he was home, so I asked him if he wanted me to come talk
> to him so that we could confirm that he was home.

At that point, White asked to approach the bench and argued the State was bringing up the warrant

it was specifically told not to address. The following ensued:

> THE STATE:   I mean, she hasn't said anything about [the warrant].
>
> DEFENSE COUNSEL:   She said they couldn't arrest him, they don't have a legal
>                                 reason to arrest him without –
>
> THE STATE:   I mean, you and I know that, but [Hardy] doesn't know that. The
>                        jury doesn't know that.
>
> DEFENSE COUNSEL:   The jury now has been led to believe there was a reason
>                                 to arrest him other than this case, which is in violation of
>                                 the Court's ruling.

The trial court asked whether there was anything White was asking it to do and if he wanted it to

instruct the jury to disregard Hardy's last answer. White responded "no" but asked whether the

State needed to talk to Hardy on the issue. The State responded it would instruct her once more.

### (3)   The third alleged violation

Finally, White contends the State violated the trial court's in limine order when Hardy

provided the following testimony:

> Because I needed to confirm that he was home. I knew he was there, but in order
> for them to come out swiftly and as fast as I needed them to, I did say that. I was--
> he hadn't pulled the gun on me that day. He had pulled it out on me--

At that point, the State interrupted her, and White asked to approach. White argued that this was

mentioning prior incidents with guns in violation of the trial court's order and his rights. White

moved for a mistrial. White asserted that, even though she did not say the word "warrant," she

11

nonetheless mentioned, "they can't arrest him until they know he's there," which implies there existed a warrant. The trial court responded as follows:

> All right. Let me think about it for just a second.
>
> All right. The Court is reviewing what is in the--at least what I can see. It's not the official record, but I'm looking at the realtime. So the jury is presumed to follow any Court's instructions. I can instruct the jury, admonish them to disregard or instruct them to disregard. The State has been admonished. There's been a limiting instruction which I have already read to the jury and I will include at the charge.
>
> At this point I'm just going to advise the State to please communicate again--the jury is not present--about her testimony, and I will overrule the motion for a mistrial.

The trial court then brought back the jury and continued with the trial.

### C. Application of the *Mosley* factors

In applying the three-factor *Mosley* test to determine whether the trial court erred in denying his motion for mistrial, we first examine "the severity of the misconduct, or in other words, the magnitude of the prejudicial effect of the prosecutor's [misconduct]." *Archie*, 340 S.W.3d at 740. As to the 911 call, the State's error in playing the offending statement is not highly prejudicial as it was non-testimonial in nature. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). The State then withdrew and offered a redacted exhibit of the 911 call. Additionally, Hardy's statement to the 911 operator that White had been harassing her was not prejudicial as it was brief and nonspecific. Further, there was other evidence presented to the trial court of White's text messages and voicemails sent to Hardy which are not complained of on appeal. As for the other two alleged violations, Hardy never mentioned past harassment as the State interrupted her testimony before she could generally complete her statements. Also, we reject White's contention that Hardy impliedly mentioned prior warrants for White's arrest. We conclude the first factor supports the trial court's denial of the mistrial motion.

12

For the second *Mosley* factor, "the reviewing court considers the character of the measures adopted to cure the misconduct." *Archie*, 340 S.W.3d at 741. The second factor assumes the existence of error. We do not agree there was error, but even so, the trial court promptly instructed the jury to disregard the mention in the 911 call. However, in the other two alleged violations, White did not request an instruction. Still, the trial court warned the State to instruct Hardy before going forward with its presentation of evidence. We determine the second factor supports the trial court's denial of mistrial as well.

For the third *Mosley* factor, "the reviewing court looks to the certainty of a conviction absent the misconduct." *Archie*, 340 S.W.3d at 741. Again, assuming error, we have already concluded there was sufficient evidence supporting the jury's implied rejection of self-defense. Subsumed in that analysis, we also concluded the record evidence supported the jury's verdict of guilty on the charged offense. We conclude the third factor supports the trial court's denial of a mistrial.

Given our analysis of the *Mosley* factors, we conclude the alleged violations did not warrant the extraordinary remedy of a mistrial. Accordingly, We overrule White's first issue.

### RIGHT TO COUNSEL

In White's presentation of his second issue, he asserts the trial court erred in allowing a "video tape of the interview" to be entered into evidence because the State violated his Sixth Amendment right to counsel when police questioned him after his request for counsel. In response, the State asserts the record shows White understood his rights, he neither invoked his right to remain silent nor his right to counsel, and that he waived his rights by freely and voluntarily speaking with the police officer.

In support of his issue, White asserts the State failed to meet the requirements of the two-pronged *Edwards* test. *See Edwards v. State*, 451 U.S. 477, 484–485 (1981) (providing that once a suspect invokes his *Miranda* rights, authorities must wait for counsel to be available to a suspect, unless the suspect "initiates further communication, exchanges, or conversations with the police"); *Cross v. State*, 144 S.W.3d 521, 523–524 (Tex. Crim. App 2004) (acknowledging *Edwards*' bright line rule protecting an accused from police badgering while in custody). He asserts that because he expressed a desire to confer with counsel, all interrogation should have stopped unless he then voluntarily initiated further communication and expressly waived his right to counsel. White points to the trial testimony of police officer Ruiz and detective Alvarez to assert the two-pronged test was not met. In doing so, he merely mentions that officer Ruiz testified that White initiated communications concerning his need for medical attention, while detective Alvarez acknowledged that he was not informed that White had asked for medical assistance. Yet, missing from White's briefing, he fails to provide any citation to the record of where it could be found that he requested counsel or otherwise invoked his right to remain silent. Moreover, White makes no reference to any custodial "interview" of any kind that followed his invocation of his rights.

Even so, our independent review of the record shows it lacks any such custodial "interview" of White. Instead, our record on appeal includes bodycam videos from four different SAPD officers. At trial, White only objected to State's Exhibit 46, and it was the only evidence subjected to an Article 38.22 hearing.[2] State's Exhibit 46 is identified as the bodycam video of Detective Michael Alvarez. At trial, White argued the video should be suppressed because White

---

[2] In codifying *Miranda v. Arizona*, Article 38.22 governs the admissibility of a defendant's custodial statement. *See* Tex. Code Crim. Pro. Ann. art. 38.22.

had made it clear that he did not want to talk to the detective, so any statements made by him were not made freely and voluntarily.

In briefing on appeal, however, White asserts he had requested counsel and SAPD officers violated his Sixth Amendment rights by continuing to interview him without his counsel present. In addition to not being supported by the record, White's complaint fails because his arguments were not raised at trial. To preserve an issue for appellate review, the complaining party must make a timely, specific objection and obtain a ruling. Tex. R. App. P. 33.1(a); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). Even constitutional challenges may be waived by failure to object. *See Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995). Because White's arguments on appeal do not comport with his objections at trial, we overrule his second issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

GINA M. PALAFOX, Justice

May 6, 2024

Before Alley, C.J., Palafox and Soto, JJ.
Soto, J., concurring without opinion.

(Do Not Publish)

15